LENNAR CORPORATION, Lennar Homes of Texas Sales & Marketing Ltd., and Lennar Homes of Texas Land & Construction Ltd., Petitioners,

v.

MARKEL AMERICAN INSURANCE COMPANY, Respondent.

No. 11–0394.

Supreme Court of Texas.

Argued Oct. 16, 2012.

Decided Aug. 23, 2013.

Rehearing Denied Dec. 13, 2013.

David Hurst Brown, Brown & Kornegay, LLP, James L. Cornell, Gardere Wynne Sewell LLP, Vincent Eugene Morgan, Pillsbury Winthrop Shaw Pittman LLP, Houston, TX, Erika Lea Blomquist, Haynes & Boone, LLP, Ernest Martin Jr., Haynes & Boone, LLP, Dallas, TX, Lee H. Shidlofsky, Shidlofsky Law Firm LLP, William J. Chriss, Law Offices of William J. Chriss, Austin, TX, Marc E. Gravely, Gravely & Pearson, LLP, San Antonio, TX, Patrick J. Wielinski, Cokinos Bosien & Young, Irving, TX, for Amicus Curiae Certain Texas Insurance Coverage Lawyers.

Laura A. Foggan, Wiley Rein & Fielding, LLP, M. Addison Draper, Wiley Rein LLP, Washington, DC, Wade Caven Crosnoe, Thompson Coe Cousins & Irons, L.L.P., Austin, TX, for Amicus Curiae Complex Insurance Claims Litigation Association.

Manuel (Ned) Munoz, Jr., Texas Assoc. of Builders, Austin, TX, for Amicus Curiae National Assoc. of Home Builders & Tx. Assoc. of Builders.

Lee H. Shidlofsky, Shidlofsky Law Firm LLP, Austin, TX, for Amicus Curiae Texas Association of Builders.

Patrick J. Wielinski, Cokinos Bosien & Young, Irving, TX, for Amicus Curiae Texas Building Branch.

J. James Cooper, John W. Slates, Gardere Wynne Sewell LLP, Stacy R. Obenhaus, Dallas, TX, Samantha Kay Boutte Trahan, Gardere Wynne Sewell LLP, Houston, TX, for Petitioners Lennar Corporation.

Chester Dennis Barrow Jr., Timothy F. Lee, Wendy Ware, Ware Jackson Lee & Chambers LLP, John E. Nelson III, Houston, TX, for Respondents Markel American Insurance Company.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice GREEN, Justice JOHNSON, Justice WILLETT, Justice GUZMAN, Justice LEHRMANN, and Justice DEVINE joined.

Having determined that homes built with an exterior insulation and finish system ("EIFS") suffer serious water damage that worsens over time, a homebuilder undertook to remove the product from all the homes it had built and replace it with conventional stucco. The homebuilder's insurers refused to cooperate with this remediation program, preferring instead to wait until homeowners sued, and denied coverage of the costs. This litigation, lasting more than twelve years, ensued. Now, only one insurer remains, and the issues have been winnowed to two:

- Not having consented to the homebuilder's remediation program, is the insurer nevertheless responsible for the costs if it suffered no prejudice as a result?

- Is the insurer responsible for (i) costs incurred to determine property damage as well as to repair it, and (ii) costs to remediate damage that began before and continued after the policy period?

We resolve these issues in the homebuilder's favor, reverse the judgment of the court of appeals,[1] and reinstate the judgment of the trial court.

## I

Long used in commercial construction, EIFS was marketed in the early 1990s as an attractive alternative to conventional stucco in home construction. But installed

---

1. 342 S.W.3d 704 [*Lennar II*], following remand in *Lennar Corp. v. Great Am. Ins. Co.,* 200 S.W.3d 651 (Tex.App.–Houston [14th Dist.] 2006, no pet.) [*Lennar I*].

on wood-frame walls typical of single-family homes, EIFS traps water inside, causing rot and structural damage, mildew and mold, and termite infestations.[2] Damage is often undetectable from a visual inspection of the exterior of the home. Lennar Corporation and another homebuilder it bought[3] built some 800 homes using EIFS, but stopped using it in 1998. After the problems with EIFS were exposed on the NBC television show *Dateline* in 1999, homeowner complaints poured in. Lennar investigated and learned that the problems associated with EIFS were frequent and substantial. Property damage typically began six to twelve months after EIFS was installed, progressed more or less, depending on the proximity of water due to rain and yard irrigation, and continued until the EIFS was removed. Lennar decided not merely to address complaints as it received them but to contact all its homeowners and offer to remove the EIFS and replace it with conventional stucco. Lennar began its remediation program in 1999 and finished in 2003. Almost all the homeowners accepted Lennar's offer of remediation. A few were paid cash.[4] Only three ever sued.[5] All settled.[6]

Early in the process, Lennar notified its insurers that it would seek indemnification for the costs. The insurers refused to participate in Lennar's proactive, comprehensive efforts, preferring instead to wait and respond to homeowners' claims one by one. All the insurers denied coverage, and in 2000, Lennar sued. The trial court granted summary judgments for the insurers, and the court of appeals affirmed for all but two: American Dynasty Surplus Lines Insurance Company, which had provided Lennar a $1 million primary commercial general liability policy with an annual $1 million self-insured retention, and Markel American Insurance Company, which had provided a $25 million commercial umbrella policy, in effect from June 1, 1999 through October 19, 2000.[7] On remand, Lennar settled with American Dynasty, leaving only its claims against Markel for trial.

Among the many disputes the court of appeals resolved was whether Lennar's costs to remove and replace EIFS as a preventative measure were incurred "because of ... property damage" and thus covered by the policies.[8] The court held they were not:

> Lennar arguably made a good business decision to remove and replace all the EIFS to prevent further damage. Nonetheless, ... we cannot conclude that it was necessary for Lennar to remove and replace all the EIFS in order to repair the water damage, if any, to each home. Therefore, the costs in-

---

**2.** The problems with using EIFS in home construction have become familiar to us. *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893 (Tex.2010); *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650 (Tex. 2009); *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex.2008).

**3.** Petitioners are Lennar Corporation and two subsidiaries, Lennar Homes of Texas Sales & Marketing Ltd. and Lennar Homes of Texas Land & Construction Ltd. Lennar Corporation bought Village Builders in 1996. All are collectively referred to as "Lennar".

**4.** *See Lennar I*, 200 S.W.3d at 661 n. 4 ("Lennar paid cash settlements to a few homeowners").

**5.** *Id.* at 661 n. 3 ("Of the approximately 400 homes involved, only two homeowners filed suit against Lennar."). The record, however, contains references to three lawsuits.

**6.** *Lennar II*, 342 S.W.3d at 714 ("It is undisputed that Lennar entered into a settlement agreement with each homeowner.").

**7.** *Lennar I*, 200 S.W.3d at 685, 691, 704.

**8.** *Id.* at 677.

curred by Lennar to remove and replace EIFS as a preventative measure are not [covered]. Accordingly, Lennar must apportion the EIFS-related damages between its costs to remove and replace EIFS as a preventative measure and its costs to repair water damage to the homes.[9]

Lennar and Markel also disputed whether coverage was precluded by Lennar's failure to comply with Condition E of the policy, which states in part: "it is a requirement of this policy that ... no insured, except at their own cost, voluntarily make any payment, assume any obligation, or incur any expense ... without [Markel's] consent". Markel had not consented to Lennar's remediation settlements.[10] Citing our decision in *Hernandez v. Gulf Group Lloyds*,[11] the court held that Markel's liability was not excused unless it could prove, as a matter of fact, that it had been prejudiced by Lennar's settlements with homeowners.[12] Neither Lennar nor Markel sought review of the court of appeals' decision. Both have accepted that court's holdings as governing the case.

At trial against Markel, Lennar offered evidence that the extent of water damage to a home could not be determined without removing all the EIFS, though when that was done, some homes turned out to have only limited damage, and some had none at all. Lennar offered evidence of its remediation costs for only 465 homes that had some water damage, but it included costs for removing and replacing all the EIFS on the homes, even if only part of a home was damaged. Lennar offered no evidence of the costs of work done on a few homes that turned out to be completely undamaged. At Lennar's request, the tri-

al court asked the jury to find for each home the amount "incurred in payment of property damage", defined as:

- The cost to remove and replace the EIFS in order to access and repair underlying water damage *or in order to determine the areas of underlying water damage.*

- The cost to repair any water damage to the home.

- The cost to repair broken windows, cracked driveways, landscaping, and other parts of the home that were damaged in the course of repairing water damage to the home.

(Emphasis added.) The court overruled Markel's objections that the italicized phrase did not describe a cost incurred "because of ... property damage" under its policy and that Lennar had not segregated covered and uncovered costs as directed by the court of appeals.

After hearing evidence for eight days, the jury found that Lennar's defective use of EIFS in home construction "create[d] an imminent threat to the health or safety of the inhabitants of the homes", and that Lennar took "reasonable steps to cure the construction defect as soon as practicable and within a reasonable time". Lennar argued that these findings established its legal liability to the homeowners under the Residential Construction Liability Act ("RCLA").[13] The jury failed to find that Markel was prejudiced by Lennar's "failure to obtain Markel's consent (a) to enter into any compromise settlement agreement, or (b) to voluntarily make any payment, assume any obligation, or incur any expense". The trial court rendered judg-

---

**9.** *Id.* at 679–680.

**10.** *Id.* at 695 n. 58.

**11.** 875 S.W.2d 691, 692–694 (Tex.1994).

**12.** *Lennar I,* 200 S.W.3d at 695.

**13.** Tex. Prop.Code §§ 27.001–.007.

ment awarding Lennar $2,965,114.16, the damages found by the jury less a $425,000 credit for settlements with other insurers, $2,421,825.89, the attorney fees found by the jury, and $1,227,476.03 in prejudgment interest.

The court of appeals reversed and rendered judgment for Markel on two grounds.[14] One was that Lennar had not established its legal liability to the homeowners to trigger Markel's coverage.[15] The court concluded that the RCLA did not make Lennar legally liable to the homeowners because it does not create a cause of action,[16] and that the policy did not allow Lennar to show legal liability to the homeowners using settlements to which Markel had not agreed.[17] Markel had also argued that it was prejudiced by Lennar's violation of the consent-to-settlement provision in Condition E, but the court reasoned that it did not need to address that issue given its disposition in the case.[18]

The other ground for the court's decision was that Lennar had not offered evidence of damages covered by the policy. The court concluded that "[t]he removal and replacement of EIFS 'in order to determine the areas of underlying water damage' as defined in the charge includes merely removing and replacing EIFS as a preventative measure, whether there was property damage or not."[19] The court expressly did not address Markel's argument that Lennar had not offered evidence of damages occurring during its policy period as opposed to all the years during which Lennar was pursuing remediation.[20]

We granted Lennar's petition for review.[21] We consider first whether Lennar established its legal liability to the homeowners, then whether it properly proved the amount of its loss.

## II

■ As noted above, Condition E of Markel's policy forbade Lennar, "except at [its] own cost, [from] voluntarily mak[ing] any payment, assum[ing] any obligation, or incur[ring] any expense ... without [Markel's] consent". Though Markel did not consent to Lennar's settlements with homeowners, it concedes, as *Lennar I* held,[22] that this provision does not excuse its liability under the policy unless it was prejudiced by the settlements. *Lennar I* relied on our decision in *Hernandez v. Gulf Group Lloyds.*[23] There, the parents of a girl killed in a car accident settled

14. *Lennar II*, 342 S.W.3d at 716.

15. *Id.* at 712–16.

16. *Id.* at 713–714; *see* Tex. Prop.Code § 27.005 ("This chapter does not create a cause of action...."). The court had not addressed this issue in the first appeal. *Lennar I*, 200 S.W.3d at 680 n. 37 ("In their motions for summary judgment, several carriers argued that Lennar was not 'legally obligated to pay' the EIFS claims because it settled them voluntarily without suits being filed. According to Lennar, [RCLA] legally obligated Lennar to cure construction defects without suits being filed. On appeal, the carriers no longer argue that Lennar was not legally obligated to pay the EIFS claims." (Citation omitted.)).

17. *Lennar II*, 342 S.W.3d at 714–716.

18. *Id.* at 715 n. 10. The court also rejected Lennar's argument that it was legally liable for using a defective product. *Id.* at 714.

19. *Id.* at 711.

20. *Id.* at 712 n. 5.

21. 55 Tex. Sup.Ct. J. 755, 757, —— S.W.3d ——, —— (June 11, 2012).

22. 200 S.W.3d at 695.

23. 875 S.W.2d 691 (Tex.1994).

with the other driver for his only asset, the limit of his auto insurance policy, which was far less than their damages, then claimed uninsured/underinsured motorist ("UM/UIM") coverage under their own auto policy.[24] Their insurer had not been asked to consent to the settlement and denied the claim based on a policy exclusion for "bodily injury ... with respect to which the insured ... shall, without written consent of the company, make any settlement with any person ... who may be legally liable therefor".[25] The insureds argued that without a showing that their settlement had prejudiced the insurer, they had been denied the UM/UIM protection required by statute.[26] We did not reach that argument, concluding instead that prejudice is required by principles of contract law.[27] Generally, one party's breach does not excuse the other's performance unless the breach is material.[28] One factor in determining materiality is "the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." [29] The insurer had been deprived of only one benefit, its subrogation right against the other driver, and it stipu-

lated that it had not, as a result, incurred any financial loss.[30] Thus, we concluded, the insureds' breach by settling without the insurer's consent was not material, the insurer was not prejudiced, and coverage was not excused.[31]

At trial, Markel vigorously contended that Lennar's settlements were prejudicial, largely because Lennar offered remediation to homeowners with damaged houses who would never have sought redress had Lennar left them alone. The jury did not find Markel's position convincing or conclude that Lennar's remediation program was anything other than a reasonable approach to a serious problem. The jury was entitled to credit evidence that, had Lennar not proceeded as it did, the damages would have worsened and the remediation costs increased. In this Court, Markel nevertheless asserts that it established prejudice as a matter of law. It argues in its brief:

> When an insurer is not asked to adjust a claim, provide a defense, or be involved in negotiating a settlement, but is simply told it has to pay for a voluntary pay-

---

24. *Id.* at 692.

25. *Id.*

26. *Id.*

27. *Id.* at 692–694.

28. *Id.* at 692 ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) (stating that with exceptions, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.").

29. *Id.* at 693 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241(a) (1981)).

30. *Id.* at 693–694.

31. *Id.* Amicus curiae, the Complex Insurance Claims Litigation Association, argues that requiring prejudice before enforcing a consent-to-settlement provision simply rewrites the policy, that many jurisdictions impose no such requirement, and that *Hernandez* should be limited to UM/UIM policies. We answered the first argument in *Hernandez*: general contract law requires prejudice. *Id.* at 692. The second argument is also answered in *Hernandez*: jurisdictions differ, for various reasons, over the necessity of prejudice. *Id.* at 693 n. 4 (listing cases). In response to the third, nothing in *Hernandez* suggests that its rationale is limited to the type of insurance coverage involved.

ment, the insurer has suffered prejudice as a matter of law. That prejudice is even more stark in this case, in which the insured actively solicited claims which might otherwise never have been brought and made payments which were not covered under the Policy.[32]

Under *Hernandez,* an insurer establishes prejudice from a settlement to which it did not agree by showing that the insured's unilateral settlement was a material breach of the policy—that is, that it significantly impaired the insurer's position. Markel's argument boils down to this—had Lennar stonewalled the homeowners, fewer repairs would have been made. On this record, that is a question of fact, not of law, which the jury resolved in Lennar's favor.

But Condition E's consent-to-settlement requirement also finds expression in the policy's Insuring Agreement, and Markel argues that it can insist on compliance with this separate provision without proving prejudice. The policy obligates Markel to pay Lennar's "ultimate net loss"—defined as "the total amount of [property] damages for which [Lennar] is legally liable"[33]—and states that such loss "may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing." Markel contends that these three ways for establishing a covered loss are exclusive, and we assume, without deciding, that Markel is correct. Markel argues that this Loss Es-

tablishment Provision, unlike Condition E, is central to the policy because of its "unmistakeable language" and its purpose in preventing insureds from determining loss unilaterally, and therefore any breach is material. Lennar responds that the provision cannot operate differently than Condition E.

Assuming Markel is right, that an insurer need not show prejudice from an insured's failure to comply with a policy requirement that is "considered essential to coverage",[34] the Loss Establishment Provision does not qualify, certainly not for the reasons Markel argues. Its language is no clearer than Condition E's, and the purpose of the two provisions, precluding liability for the insured's voluntary payments without the insurer's consent, is exactly the same. The Loss Establishment Provision is no more central to the policy than Condition E, and the requirement that Markel show prejudice from Lennar's non-compliance with either operates identically. Markel failed to prove that it was prejudiced in any way by Lennar's settlements. To allow it to argue that Lennar cannot use those non-prejudicial settlements to establish the amount of its loss would plainly subvert the requirement that Markel show that Lennar's non-compliance was material. The jury's failure to find prejudice leaves but one conclusion: that Lennar's loss as shown by the settlements is the amount Markel is obligated to pay under the policy.[35]

---

32. Markel's Brief on the Merits 42–43.

33. The obligation was, of course, subject to American Dynasty's $1 million primary coverage, Lennar's $1 million self-insured retention, and Markel's $25 million policy limits.

34. *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.,* 288 S.W.3d 374, 381 (Tex. 2009) (citing as an example the requirement in a claims-made-and-reported policy that a claim be reported to the insurer during the

policy period or within a specific number of days thereafter).

35. We do not, as the concurrence asserts, implicitly base our decision on public policy. "Generally, the State's public policy is reflected in its statutes." *Town of Flower Mound v. Stafford Estates· Ltd. P'ship,* 135 S.W.3d 620, 628 (Tex.2004) (internal quotation marks omitted). Our analysis is based on the same settled principles of contract law and textual interpretation of insurance poli-

Absent prejudice to Markel, Lennar's settlements with homeowners establish both its legal liability[36] for the property damages and the basis for determining the amount of loss.[37]

## III

We come now to the question whether the amount of damages found by the jury is covered by Markel's policy. The policy obligated Markel to pay "the total amount" of Lennar's loss "because of" property damage that "occurred during the policy period", including "continuous or repeated exposure to the same general harmful condition". Focusing on "because of", the court of appeals held that the policy covers only the cost of repairing home damage, not the cost of locating it, and because Lennar's evidence did not segregate the two, it was entitled to recover nothing.[38] Additionally, Markel argues that Lennar's evidence improperly included the cost of repairing home damage that occurred outside the policy period. The court of appeals did not reach this argument.[39] We examine each issue in turn.

## A

■ As we have explained, water damage from EIFS occurs within the walls of homes to which it is applied and thus is often hidden from sight. Lennar's evidence at trial was that the extent of damage to a home cannot be determined without removing all the EIF S. Accordingly, the only cost evidence Lennar presented was for removing all the EIFS from damaged houses, repairing the damage, and recovering the houses with conventional stucco. For a few homes, removal of the EIFS revealed no damage whatever, and Lennar did not offer any evidence of its remediation costs for those homes. But for the homes that had some damage, Lennar did not segregate its cost to repair only the damage found; it included the cost of removing EIFS from the entire house to find all the damaged areas. The jury was asked to find Lennar's costs of determining the areas of water damage as well as repairing them. Markel argues, and the court of appeals held, that the cost of determining the areas of water damage is not covered by the policy.

We have noted that the phrase, "because of", used in determining a covered loss under a commercial general liability policy, "is susceptible to a broad definition."[40] But it need not be read broadly to reach all of Lennar's remediation costs. Under no reasonable construction of the phrase can the cost of finding EIFS property damage in order to repair it not be considered to be "because of" the damage. We are not confronted with a situation in which the existence of damage was doubtful. Markel concedes that each of the 465 homes for which Lennar sought to recover remediation costs was actually damaged.

---

cies on which we based our decision in *Hernandez.*

36. Markel states in its brief that the settlement agreements did not "establish an obligation to pay anything; they commit Lennar to perform repairs." Markel's Brief on the Merits 33. The costs to perform that commitment are Lennar's legal liability.

37. Having reached this conclusion, we need not consider Lennar's contention that its liability was also established by RCLA.

38. *Lennar II,* 342 S.W.3d at 711.

39. *Id.* at 712 n. 5.

40. *Zurich Am. Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 499 (Tex.2008) (stating with respect to commercial general liability insurance policies, that "'damages because of bodily injury' is susceptible to a broad definition").

Nor could Lennar have located all the damage, which was hidden from sight, without removing all the EIFS. The court of appeals' characterization of efforts to determine all the damaged areas of homes as preventative measures is not supported by the record.

We thus conclude that Lennar's evidence supported the jury's verdict.

### B

■ According to the evidence at trial, water damage from EIFS begins within six to twelve months after home construction is completed and continues until it is repaired. Lennar stopped using EIFS in 1998. Markel's policy was in effect throughout 1999 and until October 2000. A fair inference from the record is that most of the damage to the homes began before or during Markel's policy period and continued afterward. Markel agrees that all the homes for which Lennar claims remediation costs sustained some damage during the policy period, but it insists that only the costs for remediating the damage in existence during the policy period are covered losses. Lennar concedes that it did not attempt to prove the specific amount of damage to each house during the policy period but contends that it would be practically impossible to do so and that the policy does not require it.

Coverage under Markel's policy is limited to property damage that occurs during the policy period but expressly includes damage from a continuous exposure to the same harmful conditions. For damage that occurs during the policy period, coverage extends to the "total amount" of loss suffered as a result, not just the loss incurred during the policy period. No question remains that all 465 houses at issue suffered property damage during the policy period, which began before or during the policy period and continued until it was repaired, all because of water trapped in home walls by EIFS applied to wood-frame construction. Thus, the policy covered Lennar's total remediation costs.

This reading of the policy is confirmed by our decision in *American Physicians Insurance Exchange v. Garcia*.[41] In the underlying suit, plaintiffs alleged that the defendant physician's negligence in treating their decedent extended over two-and-one-half years, during which the physician was covered at various times by four non-overlapping policies, one with $100,000 limits and the other three with $500,000 limits.[42] Plaintiffs contended that the policies could be "stacked" to provide a total of $1.6 million in coverage and demanded that the insurers settle for that amount. After the insurers refused, plaintiffs obtained a judgment against the physician in excess of that amount, and, as the physician's assignees, sued the insurers under *Stowers*.[43] We rejected the plaintiffs' stacking argument, explaining instead:

If a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies that would maximize coverage. Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit

---

**41.** 876 S.W.2d 842 (Tex.1994).

**42.** *Id.* at 843–844.

**43.** *Id.* at 853.

among themselves according to their subrogation rights.[44]

Markel dismisses this as dicta, but having said what the policy limits were not, it was important for us to say what they were and why. Our decision provides the rule governing the situation described.

Markel argues alternatively that it should be responsible along with Lennar's other insurers only for its pro rata share of the total remediation expenses. *Garcia* rejects this approach, leaving up to insurers who share responsibility for a loss to allocate it among themselves according to their subrogation rights. Markel urges us to abandon *Garcia*, based on recent cases in other jurisdictions that take a pro rata approach.[45] While we have acknowledged that allocation issues have been treated differently in other jurisdictions,[46] the decisions of those courts do not persuade us to reconsider ours in *Garcia*.

We conclude that Markel's policy covered Lennar's entire remediation costs for damaged homes.

\*     \*     \*

Lennar's responsible efforts to correct defects in its home construction did not absolve Markel of responsibility for the costs under its liability policy. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Justice BOYD, concurring.

If we were writing on a blank slate, I would hold that Markel's insurance policy does not cover Lennar's liabilities because Lennar incurred those liabilities through settlements to which Markel had not "pre-viously agreed in writing." But we are not writing on a blank slate, and our precedent compels us to disregard the policy's consent requirement because Lennar's failure to obtain Markel's prior agreement to the settlements did not harm or prejudice Markel. I therefore concur in the Court's judgment. But if we are going to continue imposing the prejudice requirement, as I agree our precedent compels us to do, we should admit we are doing so on public policy grounds, rather than continue our well-intended but ultimately inadequate efforts to justify our holdings on the basis of contract principles.

## I.

### Courts and Contracts

We have repeatedly said that we will not re-write contracts. "Courts cannot make new contracts between the parties, but must enforce the contracts as written." *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965). As the Court reaffirms today, insurance agreements are simply contracts; we construe them by applying general rules of contract construction, and we assume that the parties intended what the words of the contract say. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex.2010). "[W]e may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003).

Except, sometimes, we do. Judicially implied warranties provide one obvious example. In *Humber v. Morton*, we inserted into contracts between homebuilders and

---

44. *Id.* at 855 (footnote omitted).

45. *See Boston Gas Co. v. Century Indem. Co.,* 454 Mass. 337, 910 N.E.2d 290 (2009); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's,* 156 N.H. 333, 934 A.2d 517 (2007); *Crossmann Communities of N.C., Inc.*

*v. Harleysville Mut. Ins. Co.,* 395 S.C. 40, 717 S.E.2d 589 (2011).

46. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.,* 267 S.W.3d 20, 31 n. 45 (Tex.2008).

their purchasers an agreement that the builder warrants that the home has been constructed in a good and workmanlike manner and is suitable for human habitation. 426 S.W.2d 554, 555 (Tex.1968). And in *Melody Home Mfg. v. Barnes,* we implied a similar warranty in contracts between those hired to repair or modify tangible property and the customers who sue them for deceptive trade practices. 741 S.W.2d 349, 354 (Tex.1987). In doing so, we acknowledged that "[i]mplied warranties are created by operation of law and are grounded more in tort than in contract," *id.* at 352, but we judicially inserted them into the parties' contracts because "public policy so mandates." *Id.* at 353.

Similarly, as in this case, we have repeatedly inserted into insurance contracts a requirement that insurers must suffer harm or prejudice before they can deny coverage based on certain provisions, even though the policies' unambiguous language would have permitted the insurers to deny coverage without showing prejudice. In my view, we have struggled to explain and reconcile our holdings in these cases, primarily because we (quite understandably, in my view) want to avoid judicially inserting the prejudice requirement as a matter of public policy. I am convinced that there is now no other way to reconcile them. Although I would hold differently in the absence of our prior decisions, our precedent compels us to imply the prejudice requirement in this case as well. For the sake of consistency and predictability, however, we should acknowledge that we are doing so because "public policy so mandates."

## II.

### Precedent

This Court has directly addressed the prejudice requirement five times over the past forty years. Although we declined to impose the requirement the first time we considered it, we then did impose it in each of the subsequent cases. Our reasons for doing so have evolved in each case, to the point that, in my opinion, they are no longer logically or legally sufficient.

### A. *Cutaia*

When this Court first addressed the issue more than forty years ago, we refused to read a prejudice requirement into an insurance contract because "the matter of rewriting the insurance provisions in question is properly within the prerogative of the State Board of Insurance or the Legislature." *Members Mut. Ins. Co. v. Cutaia,* 476 S.W.2d 278, 278 (Tex.1972). *Cutaia* involved an automobile liability policy that required the insured to "forward any suit papers immediately to the [insurance] company." *Id.* The insured failed to comply with this requirement, but "the insurance company stipulated that it had not been harmed by the failure to forward the suit papers." *Id.* at 279. Nevertheless, the Court recognized that this prompt-service requirement was a condition precedent to coverage. The Court thus held that the insured's failure to fulfill the condition negated the insurer's liability because, "after all, this is what the contract says." *Id.*

### B. *Hernandez*

Twenty-two years after *Cutaia,* the Court changed course in *Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691 (Tex. 1994). *Hernandez* involved uninsured motorist coverage under an automobile policy that—like the policy at issue in the present case—required the insured to obtain the insurer's consent prior to any settlement. Unlike the present case, the consent provision was expressed as an exclusion to the coverage that the policy otherwise provided. *Id.* at 692 n. 1 (policy provided that

"[t]his insurance does not apply" to liability incurred through a settlement without consent). The insured settled a claim without obtaining the insurer's prior consent, but the trial court found that this caused the insurer "no material prejudice." *Id.* at 692. Without citing or discussing *Cutaia*, we held that "an insurer may escape liability on the basis of a settlement-without-consent exclusion only when the insurer is actually prejudiced by the insured's settlement. . . ." *Id.*

Although we noted in *Hernandez* that "[m]ost other jurisdictions presented with this issue have likewise imposed a prejudice requirement, primarily on public policy grounds," *id.* at 693 n. 4, we did not characterize our holding as one based on public policy considerations. Instead, we reasoned that the insured breached the agreement by failing to obtain the insurer's consent, but the breach was not material because it did not cause harm or prejudice to the insurer, and it therefore did not release the insurer from its obligation to perform. *Id.* at 693–94. Justice Enoch dissented because he did not agree that the insured's failure to obtain the insurer's consent was a breach of the agreement. Instead, the consent requirement simply defined what the policy covered, or more specifically, what the policy excluded from coverage. In Justice Enoch's view, *Hernandez* is not a case "about a breach of contract. This case is about coverage." *Id.* at 694 (Enoch, J., dissenting).

## C. *PAJ*

We have addressed the prejudice requirement three times since *Hernandez,* and in each case we have imposed the prejudice requirement. First, in *PAJ, Inc. v. Hanover Insurance Co.,* we considered a provision in a commercial general liability policy that required the insured to notify the insurer of any claim or suit "as soon as

practicable." 243 S.W.3d 630, 631 (Tex. 2008). The parties stipulated that the insured failed to comply with this requirement, but they also stipulated that the insurer was not prejudiced by the untimely notice. *Id.* Although the parties disagreed on whether the provision was a condition precedent (as in *Cutaia*) or "merely a covenant," we held—in a 5–4 split decision—that, in either case, the insured's failure to provide prompt notice would negate coverage only if the insurer was prejudiced. *Id.* at 632–33. As in *Hernandez,* we did not insert the prejudice requirement as a matter of public policy, but instead reasoned that the insured's failure to give prompt notice would negate coverage only if it was "a material breach." *Id.*

The four dissenting Justices concluded that the prompt-notice requirement was a condition precedent rather than a covenant, and to them that was the controlling difference: "*Hernandez's* materiality-of-breach analysis is inapposite here because PAJ did not breach a covenant. Rather, it failed to comply with a condition precedent, a strict requirement that precedes any obligation on the part of Hanover under the policy." *Id.* at 639 (Willett, J., dissenting).

In a discussion that is crucial to my decision in the present case, however, the dissent in *PAJ* distinguished that policy's prompt-notice requirement (which it considered to be a condition precedent) from the settlement-without-consent provision in the policy at issue in *Hernandez* (which it considered to be a covenant). In the dissent's view, settlement-without-consent covenants differ from prompt-notice conditions because a breach of the former "might occur long after the insurer has learned of a suit and assumed its duty to defend." *Id.* Not inserting the prejudice requirement into a settlement-without-consent provision, the dissent reasoned, thus

"makes little sense from a timing standpoint [and] also disserves the interests of both parties to the insurance contract." *Id.* "Considering the prejudice, if any, to the insurer of a breach of the consent requirement is therefore warranted." *Id.* (Willett, J., dissenting).

### D. *Prodigy*

The following year, we addressed the issue again in *Prodigy Communications Corp. v. Agricultural Excess & Surplus Insurance Co.,* 288 S.W.3d 374 (Tex.2009). *Prodigy* also involved a prompt-notice provision, but unlike the "occurrence-based" commercial general liability policy at issue in *PAJ,* the policy at issue in *Prodigy* was a "claims-made" directors' and officers' liability policy.[1] *Id.* at 375. More accurately, the *Prodigy* policy was a "claims-made-and-reported" policy, in that it required, "as a condition precedent" to coverage, that the insured give written notice of the claim to the insurer "as soon as practicable ... but in no event later than ninety (90) days" after expiration of the policy's coverage period. *Id.* at 375, 379 n. 7. Thus, the policy only covered claims that the insured received and reported to the insurer during the coverage period or the 90 days thereafter, and required the insured to report the claim "as soon as practicable" within that time frame.

Prodigy received the claim and gave the required notice within the 90-day period, but did not do so as soon as practicable.

The insurer conceded, however, that it suffered no prejudice from the delayed notice. In a 6–3 split decision, the Court held that the insured's failure to give notice of the claim as soon as practicable would negate coverage only if the failure prejudiced the insurer. *Id.* at 375. As in *PAJ,* the Court reasoned that the insured's failure to give notice as soon as practicable was a breach of the agreement, but the breach would excuse the insurer's performance only if it was material. *Id.* at 378. And also as in *PAJ,* the Court held that the prejudice requirement applies regardless of whether the provision is expressed as a covenant or a condition precedent. *Id.*

Notably, however, the Court in *Prodigy* recognized an important difference between the policy's requirement that the insured give notice within 90 days of the coverage period and that it do so as soon as practicable during the coverage–period–plus–90–days time frame. Specifically, the Court explained that, unlike the "as soon as practicable" requirement, the 90-day deadline actually "define[s] the scope of coverage" in a claims-made-and-reported policy, "by providing a certain date after which an insurer knows it is no longer liable under the policy." *Id.* at 380 (quoting *Resolution Trust Corp. v. Ayo,* 31 F.3d 285, 289 (5th Cir.1994)). The Court thus reasoned that, because the 90-day notice deadline "is considered essential to coverage" under the policy, the insured's failure

---

1. As we explained in *PAJ,* a "claims-made" policy "'only covers those claims first asserted against the insured during the policy period.... This coverage differs from "occurrence" type coverage, ... which covers only claims arising out of occurrences happening within the policy period, regardless of when the claim is made.'" *Prodigy,* 288 S.W.3d at 378 (quoting 3 ROWLAND H. LONG, THE LAW OF LIABILITY INSURANCE § 12A.05[3] (2006)). Stated otherwise, "'[a] 'claims-made' policy covers occurrences [that] may give rise to a claim that comes to the attention of the insured and is made known to the insurer during the policy period. An 'occurrence' policy covers all claims based on an event occurring during the policy period, regardless of whether the claim or occurrence itself is brought to the attention of the insured or made known to the insurer during the policy period." *Yancey v. Floyd W. & Co.,* 755 S.W.2d 914, 918 (Tex. App.–Fort Worth 1988, writ denied) (citations omitted).

to report the claim by that deadline *would* negate coverage even if the insurer suffers no harm or prejudice. *Id.* at 381. But if, as actually occurred in *Prodigy,* the "insured gives notice of a claim within the policy period or other specified reporting period, the insurer must show that the insured's noncompliance with the policy's 'as soon as practicable' notice provision prejudiced the insurer before it may deny coverage." *Id.* at 382.

The three Justices who dissented in *Prodigy* had also dissented in *PAJ.* As in *PAJ,* they concluded that, because the prompt-notice requirement was expressed in the policy as a condition precedent, the insured's failure to give prompt notice negated coverage regardless of whether the insurer was prejudiced. *Id.* at 383 (Johnson, J., dissenting). Importantly for my decision in the present case, they disagreed with the majority's distinction between the "as soon as practicable" requirement (to which the majority implied the prejudice requirement) and the 90–day deadline (to which the majority would not have implied the prejudice requirement) because, in the dissent's view, both requirements were essential to the parties' bargain as stated in the contract. *Id.* at 384 (Johnson, J., dissenting).

### E. *Financial Industries*

Finally, on the same day we issued our decision in *Prodigy,* we answered a certified question in *Financial Indus. Corp. v. XL Specialty Ins. Co.,* 285 S.W.3d 877 (Tex.2009). The policy at issue in *Financial Indus.* was a claims-made policy that required, "as a condition precedent" to coverage, that the insured give the insurer written notice of any claim "as soon as practicable," but (unlike the policy in *Prodigy*) it did not impose a specific notice deadline that limited the scope of coverage. *Id.* at 877–78. In other words, it was a claims-made policy, but not a claims-made-and-reported policy. Without any dissent, the Court held that the insurer could not deny coverage without showing that the insured's failure to provide notice as soon as practicable prejudiced the insurer. *Id.* at 879. Following *Prodigy,* the Court reasoned that, absent a showing of prejudice, the insured's failure to provide prompt notice did not deny the insurer "the benefit of the claims-made nature of its policy," and thus the breach was not material.

## III.

### Application

Like the Court in *Cutaia* and the dissents in the subsequent cases, I believe we have pursued the wrong path in our dealings with this issue. "The better choice for courts, as the Court noted in *Cutaia,* is if changes to insurance policy language are to be mandated ... the changes should be left to the Legislature and regulatory agencies." *Prodigy,* 288 S.W.3d at 388–89 (Johnson, J., dissenting). Out of respect for the parties' freedom of contract, "this Court should not overreach its boundaries and imply new standards into insurance contracts." *Hernandez,* 875 S.W.2d at 694 (Enoch, J., dissenting) (citing *Cutaia,* 476 S.W.2d at 281).

Moreover, I believe the Court's attempt to explain and reconcile these decisions based on contract principles has only muddied the waters and is no longer workable. In *Hernandez,* we acknowledged that most jurisdictions have "imposed a prejudice requirement, primarily on public policy grounds," 875 S.W.2d at 693 n. 4, but we chose not to do so, and instead imposed the prejudice requirement as a logical result of the rule that a party's breach of contract excuses the other party's performance only if the initial breach is material. That analysis worked fine for *Her-*

*nandez*, but it has become unworkable as the subsequent cases have required the Court to address a variety of provisions (prompt service of suit papers, prompt notice, and settlement-without consent) that serve a variety of purposes within the policies (conditions precedent, covenants, exclusions, definitions, and descriptions of the scope of coverage).

Here, we are faced with a policy that expressly requires the insured to obtain the insurer's written agreement before settling a claim, but it does so in two different places and to serve two different purposes. In the Policy Conditions, the requirement is a condition precedent, and the majority holdings in *PAJ* and *Prodigy* clearly require that we impose the prejudice requirement on that condition. In the Insuring Agreement's Definitions, however, the settlement-without-consent provision defines the scope of the policy's coverage: the policy only covers an "ultimate net loss," which in the case of a settlement is established only by "a compromise settlement to which we have previously agreed in writing." In this provision, Lennar expressly agreed that Markel would only cover losses incurred through settlements to which Markel agreed in advance and in writing. This was the extent of the coverage Lennar purchased. Because Markel did not consent to the settlements with the homeowners in advance and in writing, the coverage that Lennar agreed to purchase from Markel simply did not extend to those losses.

The Court imposes a prejudice requirement anyway, based on the contract principle that, "[g]enerally, one party's breach does not excuse the other's performance unless the breach is material." *Ante* at 755. But no one (not even the Court[2]) asserts that Lennar "breached" the poli-

cy's Insuring Agreement by settling the claims without first obtaining Markels' written consent. The policy did not prohibit Lennar from settling claims without Markel's consent; it just didn't provide coverage for such a settlement. Lennar's failure to obtain Markel's prior written consent could not give rise to a cause of action for breach of the Insuring Agreement Definition. Instead, it simply prevented the settlements from falling within the types of liabilities that Lennar paid Markel to cover.

In this sense, the Insuring Agreement provision is akin to the 90–day deadline that the *Prodigy* majority agreed would be enforceable *without* a showing of prejudice. *See Prodigy*, 288 S.W.3d at 381–82 & n. 10 ("most courts have found that an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice of a claim within the policy's specified time frame," and "[w]e agree with this analysis"). The Justices who dissented in *Prodigy* disagreed with the majority's distinction between the 90–day deadline and the "as soon as practicable" requirement. *Id.* at 385 ("the policy language shows [the parties] intended for the two notice provisions to have the same effect: both are conditions precedent to Prodigy's rights under the policy") (Johnson, J., dissenting). They would not have imposed the prejudice requirement on the 90–day deadline or the "as soon as practicable" requirement. And yet in *PAJ*, those same dissenting Justices agreed that the imposition of a prejudice requirement on a settlement-without-consent provision is "warranted." 243 S.W.3d 630, 639 (Willett, J., dissenting).

Logically, the majority Justices who decided to impose the prejudice requirement

---

**2.** *See ante* at 753 (referring to Lennar's "failure to comply" and "non-compliance," rather than to its "breach" of the policy's Insuring Agreement).

in *Prodigy* should decide not to do so in the present case because the settlement-without-consent provision in the Insuring Agreement (like the 90–day period in the *Prodigy* policy) "defines the limits of the insurer's obligation" and "is considered essential to coverage" under the policy. *Id.* at 380, 381. And the dissenting Justices who would not have imposed the prejudice requirement in *PAJ* or *Prodigy* should decide to impose it in the present case because this case involves a settlement-without-consent requirement. *PAJ*, 243 S.W.3d at 633.

In today's ruling, the Court does not address these variables, but instead abruptly concludes that the Insuring Agreement's consent requirement is "no clearer" than, has "exactly the same" purpose as, "is no more central to the policy than," and "operates identically" to Condition E's consent requirement. *Ante* at 756. I disagree with these conclusions, as should those who joined the majority in *Prodigy*. In my view, at least, the Insuring Agreement "clearly" limits coverage to settlements to which Markel previously agrees in writing, does so for the "purpose" of defining the scope of coverage rather than imposing any affirmative obligation on Lennar, and is therefore "central" to the coverage that the policy provides and "operates" differently than Condition E.

The Court essentially holds that it does not matter where in the policy a settlement-without-consent provision is located, and it does not matter whether it is expressed as a condition precedent, a covenant, an exclusion to coverage, or a definition of the scope of coverage. Presumably, the Court shares Lennar's concern that the prejudice requirement would be easily circumvented if we allowed it to turn on such variables, because insurers could simply move the appropriate sentences into the definition portion of their agreements and thereby avoid the prejudice requirement. But I do not see what is wrong with that. If "parties are free to contract as they choose," *Solar Applications Eng., Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 112 (Tex.2010), they can define the scope of coverage however they may agree to do so, subject only to statutory, regulatory, or judicially-imposed policy limitations.

I believe the Court's effort to parse through all the variables affecting the prejudice requirement has only made Texas law more uncertain and has thereby rendered a disservice to both insureds and insurers alike. In my view, we should either imply a prejudice requirement as a matter of public policy, or not. Again, if we were writing on a clean slate, I would not. But, I "recognize the impropriety of unsettling questions [that] have been well settled by former decisions of this Court, and thereby rendering the law uncertain...." *Higgins v. Bordages*, 88 Tex. 458, 31 S.W. 803, 804 (1895). I agree that, with only rare exceptions, stare decisis dictates that we "adhere to our precedents for reasons of efficiency, fairness, and legitimacy...." *Sw. Bell Tel. Co., L.P. v. Mitchell*, 276 S.W.3d 443, 447 (Tex.2008) (citations omitted). Although I believe the Court should defer to the Legislature to decide whether and when to insert policy-based requirements into private contracts, we have repeatedly inserted the prejudice requirement for more than twenty years, and it would be imprudent to suddenly stop doing so now.

## IV.
### Conclusion

Although our precedents may be difficult to understand and reconcile, they have undoubtedly given insurers, insureds, reg-

ulators, and even the Legislature reason to expect and rely on the implied prejudice requirement. I agree we should not now alter these reasonable expectations. But for the sake of clarity, consistency, and predictability, I would stop trying to imply the requirement based on contract principles. I would instead expressly hold that, as a matter of public policy, a prompt-notice, prompt-service, or settlement-without-consent provision will negate coverage only if the lack of prompt notice, prompt service, or consent causes harm or prejudice to the insurer. Because Lennar's failure to obtain Markel's prior written agreement to Lennar's settlements did not harm or prejudice Markel, I concur in the Court's decision to reverse the judgment of the court of appeals and affirm the judgment of the trial court.