# IN THE SUPREME COURT OF TEXAS

No. 12-0867

BOB GREENE, AS NEXT FRIEND OF LEWAYNE GREENE, PETITIONER,

v.

FARMERS INSURANCE EXCHANGE, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

JUSTICE BOYD, joined by JUSTICE WILLETT, concurring.

"[T]he tendency of the law must always be to narrow the field of uncertainty." Oliver Wendell Holmes, Jr., THE COMMON LAW 127 (1909). Today, unfortunately, uncertainty prevails.

For over a hundred years, this Court enforced insurance policies as written. Then, thirty years ago, the Court judicially wrote a prejudice requirement into an aviation insurance policy, concluding that public policy reasons required that result. Ten years later, the Court issued the first in a series of four decisions in which it continued to impose the prejudice requirement, but in those cases it relied on a prior-material-breach theory rather than public policy. Today, the Court holds that the material-breach theory does not apply because the provision at issue does not impose a breachable obligation on the insured but instead defines the scope of the policy's coverage, and thus there has been no breach. The Court's reasoning is sound and its result is right. But it is not consistent with our four prior decisions, because they also involved provisions that defined the scope of coverage rather than imposed a breachable obligation.

By failing to follow those cases, disapprove of them, overrule them, or adequately distinguish them, the Court leaves consumers, insurers, the Texas Department of Insurance (TDI),

and Texas courts with no logical basis for predicting when this Court will impose a prejudice requirement and when it will not. "Those who depend upon the law require continuity and predictability." *Davis v. Davis*, 521 S.W.2d 603, 608 (Tex. 1975). When it comes to insurance policies and the judicially imposed prejudice requirement, they will find neither.

## I.
## Introduction

LaWayne Greene's homeowners' insurance policy provides that the coverage for damage to her house "will be suspended effective 60 days after the dwelling becomes vacant" and will "remain suspended during such vacancy." It is undisputed that Greene's home had been vacant for more than sixty days when it was damaged by a fire. Greene contends that the vacancy provision should not apply and the policy should cover her loss because:

(1) it is unenforceable under an anti-technicality statute, *see* TEX. INS. CODE § 862.054;

(2) it is unenforceable under our material-breach coverage cases because the vacancy did not contribute to the fire or otherwise prejudice the insurer, *see Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 (Tex. 2013); *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 375 (Tex. 2009); *PAJ, Inc. v. Hanover Insurance Co.*, 243 S.W.3d 630, 631 (Tex. 2008); *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 694 (Tex. 1994); and

(3) it is unenforceable on public policy grounds under *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 937 (Tex. 1984).

The Court rejects Greene's arguments and enforces the vacancy provision, concluding that section 862.054, our material-breach coverage cases, and *Puckett* do not apply. I agree that section 862.054 does not apply, and I agree that we should not impose a prejudice requirement in this case, either under our material-breach cases or under *Puckett*'s public policy approach. But I do not agree that our four material-breach coverage cases are distinguishable from this case. In those cases, we held that insurers could not deny coverage based on policy provisions that defined the scope of coverage in terms of certain conduct by the insured (specifically, in those cases, the

2

insured's untimely notice of a claim or settlement of a claim without the insurer's consent) *unless* the insurer showed that the conduct prejudiced its interests. *See Lennar*, 413 S.W.3d at 755; *Prodigy*, 288 S.W.3d at 375; *PAJ*, 243 S.W.3d at 632; *Hernandez*, 875 S.W.2d at 694. Here, we hold that the insurer *can* deny coverage based on a policy provision that defines the scope of coverage in terms of certain conduct by the insured (specifically, the insured's vacating the home for more than sixty days) *regardless* of whether the conduct prejudiced the insurer's interests.

As I[1] and others before me[2] have observed, the Court incorrectly based its holdings in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar* on a faulty application of the material-breach rule. Today, the entire Court agrees that the material-breach rule does not apply, but it cannot meaningfully distinguish this case from those. For the very reasons the Court finds the material-breach rule does not apply in this case, it did not apply in *Lennar*, *Prodigy*, *PAJ*, and *Hernandez*. I would therefore disapprove of the reasoning in those cases. To promote stability and consistency in our jurisprudence, I would leave our holdings in those cases in place, but I would expressly decline to extend those holdings beyond the specific kinds of notice-of-claim and consent-to-settlement provisions at issue in them. I acknowledge that this is not a perfect solution because, for purposes of imposing the prejudice requirement, those kinds of provisions are not logically distinguishable from the vacancy clause at issue in this case. But it is the Court's best option at this point because it will fulfill the public expectations that those decisions have created while providing predictability and certainty for the future. While illogical certainty is admittedly undesirable, it is at least better than the illogical uncertainty that will result from the Court's decision in this case.

---

[1] *See Lennar*, 413 S.W.3d at 765–66 (Boyd, J., concurring).

[2] *See Prodigy*, 288 S.W.3d at 383–89 (Johnson, J., joined by Hecht and Willett, JJ., dissenting); *Id.* at 383 (Wainwright, J., concurring); *PAJ*, 243 S.W.3d at 637–45 (Willett, J., joined by Hecht, Wainwright, and Johnson, JJ., dissenting); *Hernandez*, 875 S.W.2d at 694–95 (Enoch, J., dissenting).

## II.
## Early Decisions and Legislative Actions

For well over a century, this Court consistently enforced insurance contracts as written. If the contract limited coverage to, or conditioned it upon, circumstances that did not exist or occur, we repeatedly denied claims for coverage, even if the absence of the circumstances did not harm or prejudice the insurance company. We did this in several cases involving fire insurance policies,[3] including disputes involving vacancy provisions like the one at issue in this case.[4] We did it in cases involving consent-to-settlement provisions like the ones at issue in *Hernandez* and *Lennar*.[5] And we did it in cases involving prompt-notice-of-claim provisions like the ones at issue in *PAJ* and *Prodigy*.[6]

---

[3] *See, e.g.*, *Hibernia Ins. Co. v. Bills*, 87 Tex. 547, 551, 29 S.W. 1063, 1064 (1895); *E. Texas Fire Ins. Co. v. Kempner*, 87 Tex. 229, 237, 27 S.W. 122, 123 (1894); *Fire Ass'n of Philadelphia v. Flournoy*, 84 Tex. 632, 636, 19 S.W. 793, 795 (1892); *Assur. Co. of London v. Flournoy*, 19 S.W. 795 (Tex. 1892); *E. Texas Fire Ins. Co. v. Clarke*, 79 Tex. 23, 25, 15 S.W. 166, 167 (1890); *Lion Fire Ins. Co. v. Starr*, 71 Tex. 733, 12 S.W. 45 (1888); *Georgia Home Ins. Co. v. Jacobs*, 56 Tex. 366, 370 (1882); *E. Tex. Fire Ins. Co. v. Dyches*, 56 Tex. 565 (1881); *Tex. Banking & Ins. Co. v. Stone*, 49 Tex. 4, 11 (1878); *Galveston Ins. Co. v. Long*, 51 Tex. 89, 92 (1879).

[4] *Long*, which this Court decided 135 years ago, involved contentions similar to those before the Court today. 51 Tex. at 91. The fire insurance policy provided that it would be void "if the [insured] premises shall . . . become vacant or unoccupied, and so remain for more than thirty days, without notice to and consent of this company, in writing . . . ." *Id.* We held that the trial court erred by instructing the jury to render a verdict in favor of the insurer only if it found that the vacancy had increased the risk. *Id.* at 91–92. Relying on the language of the parties' agreement, we concluded that "[w]hether the risk would be increased by the premises becoming vacant, was not material." *Id.* at 92. We reached a similar holding in *Kempner*, 27 S.W. at 123 ("[T]he policy is exceptionally explicit and apt in the statement of the terms of liability. It is first stated that the company will not insure vacant houses, and, to enforce the rule with certainty, it is provided that, if the house should become vacant or unoccupied without the consent of the company, the policy shall at once become null and void.").

[5] *See, e.g.*, *Guar. Cnty. Mut. Ins. Co. v. Kline*, 845 S.W.2d 810, 811 (Tex. 1992) (citing *Ford v. State Farm Mut. Auto. Ins. Co.*, 550 S.W.2d 663, 665 (Tex. 1977)).

[6] *See, e.g.*, *Members Mut. Ins. Co. v. Cutaia*, 476 S.W.2d 278, 279 (Tex. 1972); *Allen v. W. Alliance Ins. Co.*, 162 Tex. 572, 577–78, 349 S.W.2d 590, 594–95 (1961); *Am. Fid. & Cas. Co. v. Traders & Gen. Ins. Co.*, 160 Tex. 554, 561, 334 S.W.2d 772, 776 (1959); *Klein v. Century Lloyds*, 154 Tex. 160, 162–63, 275 S.W.2d 95, 96–97 (1955); *New Amsterdam Cas. Co. v. Hamblen*, 144 Tex. 306, 309–10, 190 S.W.2d 56, 58 (1945); *Sun Mut. Ins. Co. v. Mattingly*, 77 Tex. 162, 163, 13 S.W. 1016 (1890); *Dyches*, 56 Tex. at 570; *Fire Ins. Ass'n v. Miller Bros.*, 2 Wilson 288, 290, 1884 WL 8125 (Tex. App. 1884, no writ).

4

Repeatedly and resolutely, we insisted that the Court could not, or at least should not, judicially inject a prejudice requirement into the parties' written agreements.[7] Instead, we acknowledged that the Legislature and TDI (or its predecessors) were better suited to make and enforce policy judgments about whether and when to mandate or alter insurance policy terms. *See e.g.*, *Kemp*, 512 S.W.2d at 690 (deferring to "statutes and Board-approved policy provisions"); *Cutaia*, 476 S.W.2d at 279 ("[I]t is better policy for the contracts of insurance to be changed by the public body charged with their supervision, . . . or by the Legislature, rather than for this Court to insert a provision that violations of conditions precedent will be excused if no harm results from their violation.").[8]

Our deference to the Legislature was not futile. In 1874, the Legislature began regulating the business of insurance and created the Department of Insurance, Statistics and History, a predecessor to TDI.[9] In 1891, the Legislature enacted a statute that invalidated any policy provision "requiring notice to be given of any claim for damages as a condition precedent to the right to sue

---

[7] *See, e.g.*, *Kemp v. Fid. & Cas. Co. of New York*, 512 S.W.2d 688, 690 (Tex. 1974) ("We are bound to interpret the statutes and Board-approved policy provisions as written."); *Cutaia*, 476 S.W.2d at 279 ("[W]hen [a] condition precedent to liability [i]s breached, liability on the claim [i]s discharged, and harm (or lack of it) resulting from the breach [i]s immaterial."); *Hamblen*, 190 S.W.2d at 58 ("[W]e are not authorized to add the further [provision] that a showing that no loss or damages resulted from the delay would relieve the insurer of the consequences of his failure to give immediate notice."); *see also Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) ("Given this insurance policy's plain language, we are loathe to judicially rewrite the parties' contract by engrafting extra-contractual standards that neither the Legislature nor the Texas Department of Insurance has thus far decided to promulgate.").

[8] *See also Fortis Benefits*, 234 S.W.3d at 649 ("As we have said before, balancing dueling policy concerns is generally for non-judicial bodies, and it remains the 'better policy for the contracts of insurance to be changed by the public body charged with their supervision, the State Board of Insurance, or by the Legislature, rather than for this Court' to contravene the express language of insurance contracts with equitable arguments.").

[9] For a discussion of the history of TDI, *see* TDI's webpage at www.tdi.texas.gov.

thereon," unless the provision was "reasonable" and allowed at least ninety days for notice.[10] In 1903, the Legislature enacted two "anti-technicality" statutes that imposed a prejudice requirement on policy provisions that voided the policy if the insured made a false statement in the insurance contract or application[11] or if the insured made a false statement in a proof of loss or proof of death.[12] In 1913, the Legislature enacted two more anti-technicality statutes. The first invalidated any provision purporting to render the policy void if the covered property was encumbered by a lien at the time of contracting or became encumbered during the policy term.[13] The second, which is the predecessor to the statute on which Greene relies in this case, provided that a "breach or violation" of a fire insurance policy covering personal property could not render the policy void or constitute a defense to coverage "unless such breach or violation contributed to bringing about the destruction of the property."[14]

---

[10] Act of March 4, 1891, 22nd Leg., R.S., ch. 17, § 2, 1891 Tex. Gen. Laws 20, 20 (repealed). The current version of this statute is codified in section 16.071 of the Civil Practices and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 16.071.

[11] Unlike *Hernandez* and its progeny, the statutory prejudice requirement was not purely backward-looking. Instead, the statute made the voiding provision enforceable only if the insured's misrepresentation "actually contributed to the contingency or event on which said policy became due and payable" *or* was "material to the risk." Act of March 27, 1903, 28th Leg., R.S., ch. 69, § 1, art. 3096aa, 1903 Tex. Gen. Law 94, 94 (repealed). The current version of this statute is codified in section 705.004 of the Texas Insurance Code. *See* TEX. INS. CODE § 705.004.

Another article enacted at the same time prevented the insurer from relying on this type of misrepresentation provision unless the insurer gave the insured notice of the voidance of the policy within a reasonable time after discovering the misrepresentation. *See* Act of March 27, 1903, 28th Leg., R.S., ch. 69, § 1, art. 3096bb, 1903 Tex. Gen. Law 94, 94 (repealed).

[12] Under this statute, the voiding provision was enforceable only if the misrepresentation was fraudulent, material, and either misled the insurer or caused the insurer to lose a valid defense to the policy. *Id.* art. 3096cc. The current version of this statute is codified in section 705.003 of the Texas Insurance Code. *See* TEX. INS. CODE § 705.003.

[13] Act of March 31, 1913, 33th Leg., R.S., ch. 106, § 18, 1913 Tex. Gen. Law 195, 202. The current version of this statute is codified in section 2002.002 of the Texas Insurance Code. *See* TEX. INS. CODE § 2002.002.

[14] Act of March 29, 1913, 33rd Leg., R.S., ch. 105, § 1, 1913 Tex. Gen. Laws 194, 194. The current version of this statute is codified in section 862.054 of the Texas Insurance Code.

By the time we decided *Cutaia* in 1972, the Legislature had shifted much of the authority to monitor and regulate the business of insurance to TDI.[15] The Insurance Code of 1951 charged TDI with the duty of prescribing the forms used for a variety of common insurance policies.[16] The year after we deferred to the Legislature and TDI in *Cutaia*, TDI issued a new amendatory endorsement, applicable to all Texas commercial general liability (CGL) policies, which prohibited insurers from denying coverage based on the insured's failure to give timely notice, unless the lack of notice prejudiced the insurer.[17]

Since then, TDI's oversight of insurance policy forms has continued to expand. Today, the vast majority of Texas insurance policies are composed of forms that TDI has drafted or approved, and the Insurance Code prohibits an insurer from using a form that TDI has not approved for most types of policies. *See* TEX. INS. CODE §§ 2301.006(a) ("an insurer may not deliver or issue for delivery in this state a form for use in writing insurance described by Section 2301.003 unless the form has been filed with and approved by the commissioner"), 2301.003(b) (listing types of insurance covered).

In short, for over a century, the system worked. This Court's adherence to the contract language and reluctance to rewrite contracts with the benefit of hindsight are hallmarks of our

---

[15] As noted above, the Legislature created the original predecessor to TDI in the late 1800s. The Legislature has tasked TDI with, among other things, "regulat[ing] the business of insurance in this state," "protect[ing] and ensur[ing] fair treatment of consumers," and "ensur[ing] fair competition in the insurance industry in order to foster a competitive market." TEX. INS. CODE § 31.002.

[16] *See* Acts of June 7, 1951, 52nd Leg., R.S., ch. 491, arts. 5.06, 1951 Tex. Gen. Laws 868, 925–26; *see also* TEX. INS. CODE § 5.06 (automobile insurance).

[17] *See* State Bd. of Ins., *Revisions of Texas Standard Provisions for General Liability Policies-–Amendatory Endorsement—Notice*, Order No. 23080 (March 13, 1973). The endorsement stated: "As respects bodily injury liability coverage and property damage liability coverage, unless the company is prejudiced by the insured's failure to comply with the requirement, any provision of this policy requiring the insured to give notice of action, occurrence or loss, or requiring the insured to forward demands, notices, summons, or other legal process shall not bar liability under the policy." *Id.*

contract jurisprudence, but these principles are inviolable in the context of insurance contracts, where the policy language and forms are adopted or approved by an executive body created for that purpose. That is why, for over 100 years, our mantra was that "[w]e are bound to interpret the statutes and Board-approved policy provisions as written." *Kemp*, 512 S.W.2d at 690.

### III.
### Decisions Imposing a Prejudice Requirement

Thirty years ago, the Court altered course in *Puckett*, in which it decided to judicially impose a prejudice requirement on public policy grounds. 678 S.W.2d at 938. After an airplane crash caused by pilot error, the plane's owner sought insurance coverage under a policy that excluded coverage if the plane did not have a current airworthiness certificate. *Id.* at 937. The Court acknowledged that the plane did not have a current airworthiness certificate and was not covered under the express terms of the policy. *Id.* Nevertheless, the Court held that the policy covered the loss, concluding that "allowing an insurance company to avoid liability when the breach of contract in no way contributes to the loss is unconscionable and ought not be permitted. . . . It would be against public policy to allow the insurance company in that situation to avoid liability by way of a breach that amounts to nothing more than a technicality." *Id.* at 938.

Chief Justice Pope, joined by Justice McGee, dissented in *Puckett*. 678 S.W.2d at 939–40 (Pope, C.J., dissenting). He observed that the Court had "written a new clause into the policy," by "add[ing] to the contract the requirement that the insurance company must prove that the breach was the cause of the accident." *Id.* at 940. He stated that the Court's holding was, by its own acknowledgement, "contrary to the reasoning of most courts" and had "been uniformly rejected by our prior Texas decisions as it has been by the majority of jurisdictions." *Id.* (citing *Bowie*, 574

8

S.W.2d at 543).[18] And he warned that "[t]oday's decision means that insurance policies—life, casualty, fire—though agreed upon by insured and insurer, though authorized by the Board of Insurance, though clear and unambiguous, are burdened with uncertain terms that this court may from time to time determine should have been included in the parties' contract." *Id.*

As it turned out, the Court never expanded *Puckett*'s policy-based ruling beyond the context of aviation insurance cases. Instead, in 1994, it adopted a new basis for imposing a prejudice requirement: the material-breach rule. *Hernandez*, 875 S.W.2d at 694. Since then, a divided Court has applied the material-breach rule in three additional coverage cases. *See Lennar*, 413 S.W.3d at 755; *Prodigy*, 288 S.W.3d at 375–78; *PAJ*, 243 S.W.3d at 631.

### A.      *Hernandez*

In 1994, only a year after the Court enforced a settlement-without-consent clause in *Kline*, 845 S.W.2d at 811, the Court reached the opposite result under very similar facts in *Hernandez*, 875 S.W.2d at 694. As in *Kline*, the claimant in *Hernandez* was injured in a car accident, entered into a settlement with the driver who caused the accident without the insurer's consent, and then sought to recover losses in excess of the settlement under his underinsured motorist coverage. *Hernandez*, 875 S.W.2d at 692. As in *Kline*, the policy excluded coverage if the insured settled a claim without obtaining the insurer's consent. *See id.* But unlike *Kline*, in which the Court applied the settlement-without-consent provision as written, the *Hernandez* Court superimposed a

---

[18] *Puckett* represented a significant shift in the law, at least with respect to aviation insurance policies. As one Justice of the Court has observed, "*Puckett's* judicial rewriting of the parties' contract clashes head-on with our 'modest, text-based approach' to interpreting contract language" and "is starkly at odds with our insurance decisions generally, and with most American jurisdictions' aviation-insurance decisions specifically." *AIG Aviation (Tex.), Inc. v. Holt Helicopters, Inc.*, 248 S.W.3d 169, 170 (Tex. 2008) (Willett, J., dissenting). "In short, *Puckett* granted an unbargained-for expansion of coverage in the face of a bargained-for exclusion from coverage." *Id.*

prejudice requirement onto the provision. The Court reasoned that the insureds' failure to obtain consent for the settlement was a breach of the insurance policy, and a breach would excuse the insurer's obligation to perform only if the breach was material. Because the breach did not prejudice the insurer, it was not material and therefore did not excuse the insurer's performance under the policy. *Id.* at 692–93.

Justice Enoch dissented in *Hernandez*. In his view, the material-breach rule was inapplicable because the issue was not whether the settlement without consent excused the insurer from its coverage obligation but whether the insurer had a coverage obligation in the first place. *See id.* at 694 (Enoch, J., dissenting) ("[T]his case is not about a breach of contract. This case is about coverage.") Because the insurance policy expressly "d[id] not apply" if the insured settled a claim without the insurer's consent, the insurer had no coverage duty regardless of whether the Hernandezes breached the contract, materially or otherwise. *See id.*; *see also Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (discussing the difference between breach of contract and failure to fulfill a condition). Justice Enoch observed that the Court's disposition was inconsistent with its disposition in *Kline*, which involved essentially identical facts, and its reasoning was inconsistent with its reasoning in *Cutaia*, in which the Court declined to judicially impose a prejudice requirement on a notice-of-claim provision. *Hernandez*, 875 S.W.2d at 694. He also noted that the jurisdictions that had adopted a prejudice requirement for settlement-without-consent provisions had done so based primarily on public policy grounds, not on a faulty application of the material-breach rule. *Id.*

## B.     *PAJ*

Fourteen years after *Hernandez*, the conflict between *Hernandez* and our prior precedent (*Cutaia*, in particular) was squarely before us in *PAJ, Inc. v. Hanover Insurance Co.*, which

involved an insured's non-prejudicial failure to give its insurer prompt notice of a claim. 243 S.W.3d 630, 631 (Tex. 2008). In a five-four split, the Court's majority chose to follow *Hernandez*, rather than *Cutaia*, and judicially imposed a prejudice requirement. *Id.* at 635–36. *PAJ* involved a CGL policy, and thus included the TDI-mandated endorsement providing that a lack of timely notice would not defeat coverage of bodily injury or property damage claims unless the insurer was prejudiced by the delay. *Id.* at 632. But the claim at issue in the case was for an advertising injury, rather than for bodily injury or property damage, and thus the endorsement did not apply. *See id.* The policy required the insured to give the insurer notice of a claim "as soon as practicable," and the insured's right to coverage was conditioned on compliance with all of the policy's terms. *See id.* at 638 (quoting policy language). Nevertheless, the Court held that the insured's "immaterial breach" of the notice provision "does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation." *Id.* at 631.

The *PAJ* majority did not overrule *Cutaia*, distinguish it, or even explain why it did not govern. *Id.* at 632–33. Instead, the Court relied primarily on the fact that TDI had mandated the prejudice-requirement endorsement for bodily injury and property damages under CGL policies in the wake of *Cutaia. Id.* at 632. Noting that CGL policies did not cover advertising injuries when TDI passed the endorsement and the endorsement had since been expanded to cover advertising injuries, the Court implied that TDI's failure to extend the prejudice requirement to advertising injuries sooner was merely an oversight that the Court was free to judicially correct. *Id.* at 632–33.

The four dissenting justices would have followed *Cutaia* and the Court's extensive precedent in notice-of-claim disputes before *Hernandez*. *PAJ*, 243 S.W.3d at 637–39 (Willett, J., joined by Hecht, Wainwright, and Johnson, JJ., dissenting). Rather than proposing to overrule *Hernandez*, they offered a logical basis for reconciling and distinguishing *Cutaia* and *Hernandez*:

11

the notice-of-claim requirement we enforced without regard to prejudice in *Cutaia* was expressly a "condition precedent" that had to be satisfied to trigger the insurer's coverage obligation,[19] while the *Hernandez* Court had "viewed"[20] the consent-to-settle requirement in *Hernandez* as a "covenant" that the insured had breached, which would relieve the insurer of its coverage obligation only if the breach was material. *PAJ*, 243 S.W.3d at 639 (Willett, J., joined by Hecht, Wainwright, and Johnson, JJ., dissenting). The *PAJ* majority, however, rejected this distinction between "conditions precedent" and "covenants," noting that the Court had made no such distinction in *Hernandez. Id.* at 635. But *Hernandez* had no reason to address this distinction because it involved an exclusion, not a condition precedent.[21] *See Hernandez*, 875 S.W.2d at 692.

The dissenting justices also pointed out that *Cutaia*'s argument for deference to state regulators was even stronger in *PAJ* than it had been in *Cutaia* because, after *Cutaia*, TDI had elected to "surgically" insert a prejudice requirement into some notice-of-claim provisions but not others. *PAJ* , 243 S.W.3d at 641. In post-submission briefing, the insurer pointed out that, since 2000, TDI had approved a designated endorsement that included a prejudice requirement for personal and advertising injury claims similar to that for bodily injury and property damage claims.

---

[19] The policy in *Cutaia*, like the policy in *PAJ*, made the insured's compliance with "all the terms of this policy" a condition precedent to coverage. *Cutaia*, 476 S.W.2d at 278.

[20] The dissent stated: "Rather than treat the [consent-to-settle] exclusion as a condition precedent, the [*Hernandez*] Court viewed it as a covenant, an ordinary contractual obligation, the performance of which was excused only if the breach were material." *PAJ*, 243 S.W.3d at 638 (citing *Hernandez*, 875 S.W.2d at 692–93). While this is an accurate description of the reasoning in *Hernandez*, it glosses over whether the reasoning in *Hernandez* was correct. I would argue that it was not, for the same reasons the Court holds that there was no "breach" or "violation" in the present case: the policy did not obligate the insured to obtain the insurer's consent before settling a claim, it simply did not "did not apply" if the insurer settled without consent.

[21] Additionally, the *Hernandez* Court made no effort to distinguish *Cutaia*, failing to even mention it. *See Hernandez*, 875 S.W.2d at 691–93.

*Id.* at 642. In the dissent's view, TDI's adoption of the endorsement in 2000 underscored the absence of any such prejudice requirement in the pre-2000 policy at issue in *PAJ*. *See id.*

## C.      *Prodigy*

A year after we decided *PAJ*, the Court extended *PAJ*'s prejudice requirement to notice-of-claim provisions in claims-made policies. *Prodigy*, 288 S.W.3d at 375. The policy at issue in *Prodigy* covered "claims first made" against an insured during the policy term. *Id.* at 376. As "a condition precedent to [the insureds'] rights under this Policy," the policy required the insured to give the insurer written notice of a claim "as soon as practicable . . . but in no event later than ninety (90) days after the expiration" of the policy term. *Id.* A week after the policy expired, the insured notified the insurer of a claim that the insured had known about for over a year. *Id.* The insurer conceded that it was not prejudiced by the delay. *Id.* at 375. Following *PAJ*, the *Prodigy* Court held that, although the insured did not give the insurer notice of the claim "as soon as practicable," the insurer was obligated to cover the claim because it was not prejudiced by the delay. *Id.* at 382–83. Even though the policy's notice-of-claim requirement was a "condition precedent" to coverage, the Court again rejected the distinction between a condition precedent to coverage and a contractual covenant to perform. *Id.* at 378.

The insurer argued that *Prodigy* was distinguishable from *PAJ* because *Prodigy* involved a claims-made policy rather than an occurrence-based policy. *Id.* The *PAJ* Court had recognized a "critical distinction" between occurrence-based and claims-made policies in adopting the "benefit of the bargain" approach to determining materiality of a breach, indicating that notice requirements were "subsidiary to the event that triggers coverage" in occurrence-based policies but not in claims-made policies. *PAJ*, 243 S.W.3d at 631, 636 (quoting *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 658 (5th Cir. 1999)) (citations omitted). In *Prodigy*, the

Court reasoned that the policy's 90-day notice deadline was essential to the benefit of the bargain for a claims-made policy (often more accurately called a claims-made-and-reported policy) but the "as soon as practicable" limit was common in both claims-made and occurrence-based policies and was not essential to the benefit of the bargain for either. *Id.* at 378–81. The Court observed that these different limitations on notice served different purposes—the "as soon as practicable" notice requirement "serves to 'maximiz[e] the insurer's opportunity to investigate, set reserves, and control or participate in negotiations with the third party asserting the claim against the insured,'" while the requirement for notice within the policy period or within a certain number of days thereafter "is directed to the temporal boundaries of the policy's basic coverage terms" and "defines the limits of the insurer's obligation." *Id.* at 380 (quoting 13 COUCH ON INSURANCE 3D § 186:13).

Three of the four justices who dissented in *PAJ* also dissented in *Prodigy*, and the fourth concurred because, although he disagreed with the result in *Prodigy*, he agreed that the majority holding in *PAJ* dictated that result. *Prodigy*, 288 S.W.3d at 384–85 (Johnson, J., joined by Hecht and Willett, JJ., dissenting); *id.* at 383 (Wainwright, J., concurring). The dissent observed that, "when courts rewrite existing policy provisions as the Court does in this case, insurers' actuarial predictions of losses and expenses, and the process of setting premium rates to cover projected losses and expenses are disrupted." *Id.* at 387. In their view, "[p]olicy language and its effects on the insurer's business are matters better addressed through the legislative and regulatory processes than through the judicial process," because the legislative and regulatory processes allow prospective, rather than retrospective, implementation of changes to policy terms, such that premiums can be accurately assessed based on the risk actually assumed in the policy at the time the policy is issued. *Id.* at 387–88 (citing *Cutaia* in support of deference to legislative and

14

regulatory governance of insurance policy terms). Additionally, the dissent explained that the Legislature and TDI have "the time, staff, resources and expertise to investigate and bring all relevant information to bear on such issues." *Id.* at 389.

**D.** *Lennar*

Finally, the Court relied on the material-breach rule to impose the prejudice requirement again last year. In *Lennar*, a homebuilder determined that homes it had built using an exterior insulation and finish system (EIFS) were subject to serious water damage that worsened over time. 413 S.W.3d at 751. The builder decided to remove the EIFS from its homes and replace it with conventional stucco, regardless of whether the home had yet suffered from water damage, and it sought reimbursement of its costs from its insurers. *Id.* at 752. Condition E of the insurance policy provided that "no insured, except at their own cost, may voluntarily make any payment, assume any obligation, or incur any expense . . . without [the insurer's] consent." *Id.* at 753. The insurer had refused to consent to the insured's removal and replacement program because it removed and replaced all EIFS in all homes, without regard to the existence or extent of water damage to each home. *Id.* The court of appeals had held in an earlier appeal that the insurer could not deny coverage on the basis of the insured's failure to comply with Condition E unless the insurer was prejudiced by the breach, and neither of the parties asked this Court to review that holding. *See id.* ("Neither Lennar nor Markel sought review of the court of appeals' decision. Both have accepted that court's holdings as governing the case."). Because the insurer had not proven prejudice, the insurer could not deny coverage based on Condition E. *Id.* at 756.

But Condition E was not the only consent-to-settlement provision in the policy. The insured sought coverage for its "ultimate net loss," which the policy defined as "the total amount of [property] damages for which [the insured] is legally liable" as determined "by adjudication,

15

arbitration, or a compromise settlement to which [the insurer] previously agreed in writing." *Id.* The insurer argued, and the Court assumed, that these were the three exclusive means of establishing the insured's liability for an "ultimate net lost." *Id.* On this basis, the insurer argued that it did not have to prove that the insured's failure to get consent prejudiced it because the consent requirement was "essential to coverage" under the policy. *Id.*

The Court disagreed, reasoning that the consent requirement in the policy's coverage provisions served "exactly the same" purpose as the consent requirement in Condition E, and thus was "no more central to the policy that Condition E." *Id.* The Court held that the prejudice requirement "operate[d] identically" with respect to the language in both provisions, and the insurer was therefore obligated to cover the insured's costs, regardless of whether the insured was legally liable for them, unless the insurer could show prejudice. *Id.* at 756–57.

Concurring in the Court's judgment, I explained that I would have reached a different result if we were "writing on a blank slate," but I acknowledged that *Hernandez*, *PAJ*, and *Prodigy* compelled the Court's result. *Id.* at 759–66 (Boyd, J., concurring). I recognized that "our precedents may be difficult to understand and reconcile," but concluded that they were now the basis on which insurers, insureds, TDI, and the Legislature reasonably relied in drafting and entering into insurance policies. *Id.* at 765–66. However, I urged the Court, "for the sake of clarity, consistency, and predictability," to abandon its flawed material-breach approach and instead recognize that the prejudice requirement was the product of the Court's policy preferences rather than the principles of contract construction. *Id.*

## IV.
### Distinguishing the Material-Breach Coverage Cases

Today, the Court declines to apply the material-breach analysis on which it relied in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*. The Court asserts that this case is distinguishable from

16

those cases for two reasons: first, those cases involved "breaches" while this case does not, and second, the "breached" provision in those cases were immaterial while the vacancy provision in this case is material.[22] The Court is correct that there is no breach here and the provision at issue is material, and these are legally sound bases for the Court's holding, which is also correct. But these are not legally sound bases for distinguishing *Hernandez*, *PAJ*, *Prodigy*, or *Lennar*. The reasoning that leads the Court to hold that there was no breach here would lead to the same holding in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*; and the analysis that the Court used to hold the provisions in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar* were not material would lead to the same holding today. In short, either the Court is right today or it was right in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*. Both cannot be true.

## A.    The "No Breach" Argument

The Court observes that Farmers is not relying on a breach to excuse itself from a coverage obligation, but instead is relying on a provision that defines the scope of the policy's coverage. The Court explains that Greene "did not breach her obligations under the policy by moving out of her home"; instead "the parties simply agreed on the effect of Green's vacating her house." *Ante* at ___. Because there was no breach, "the question of materiality of a breach and its subsidiary issue of prejudice are not raised." *Id.* at ___. Thus, the Court rejects Greene's reliance on *Hernandez* and *PAJ* because our holdings in those cases are "rooted . . . in contract law, focusing on the principle that a party is excused from its obligations to perform under a contract only if the other party commits a material breach." *Id.* at ___.

---

[22] The Court sometimes uses the phrase "failure to comply" instead of "breach." If there is a difference between failing to comply with a contractual obligation and breaching a contractual obligation, this Court has never recognized it. To the contrary, the Texas Pattern Jury Charge and countless Texas breach of contract cases have treated a finding that a party has failed to comply with the contract as the equivalent of a breach of the contract.

I agree. Greene's policy does not obligate her to reside in the residence, and Farmers does not contend that she breached the policy by moving out of it. Instead, the policy limits the coverage to the period of time when the home is occupied and for sixty days thereafter, and Greene's act of moving out for sixty days simply placed the home outside the scope of the coverage she had purchased. The Court correctly concludes that the material-breach analysis does not apply here because the question is not whether Farmers is excused from paying on a covered claim due to a prior material breach of the policy, but rather, whether the policy covers Greene's home in light of the vacancy. The Court correctly concludes that it does not. *See id.* at __. But the same thing was true in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*.

The Court asserts that "[a]ll of these cases involved an insured's failing to do something it agreed to do or doing something it agreed not to do." *Id.* at __. This is simply incorrect. In *Hernandez*, the policy excluded underinsured motorist coverage if the insured settled with the underinsured motorist "without written consent of the company." *Hernandez*, 875 S.W. at 694 (Enoch, J., dissenting) (noting that the policy stated it "does not apply" under such circumstances). As in this case, Hernandez did not agree to obtain the insurer's consent to any settlement and thus "did not breach [his] obligations under the policy" by settling a claim without first getting his insurer's consent. Instead, "the parties simply agreed on the effect of" those actions: no coverage. *Compare id.*, *with ante* at ___.

Nor was there a breach in *Lennar*. That policy expressly defined the scope of coverage to include only those settlements to which the insurer had consented.[23] *See Lennar*, 413 S.W.3d at 755–56; *see also id.* at 764 (Boyd, J., concurring) (noting that the Court's opinion imposed a

___

[23] Again, this is according to Lennar's construction of the coverage definitions, which we assumed to be correct for purposes of the opinion.

prejudice requirement based on the prior-material-breach rule, even though "no one (not even the Court) asserts that Lennar 'breached' the policy . . . "). As in *Hernandez* and in the case here, Lennar did not agree to obtain the insurer's consent to any settlement, and its settlement without the insurer's consent "did not breach [its] obligations under the policy"; instead, "the parties simply agreed on the effect of" those actions: no coverage.[24] *Compare id.* ("Lennar's failure to obtain Markel's prior written consent could not give rise to a cause of action for breach of the Insuring Agreement Definition. Instead, it simply prevented the settlements from falling within the types of liabilities that Lennar paid Markel to cover."), *with ante* at ___.

And even if the insureds agreed to give prompt notice of a claim in the policies at issue in *PAJ* and *Prodigy*, those policies expressly conditioned the insurance coverage on the giving of such notice. Thus, like Farmers in this case, the insurers in those cases did not argue that they were "excused from performing" under the policies because "the other party commit[ted] a material breach." *See ante* at ___. Instead, the insurers argued that their policies only covered claims of which they received timely notice. *Prodigy*, 288 S.W.3d at 376 (conditioning coverage on notice "as soon as practicable" and "in no event later than ninety (90) days"); *PAJ*, 243 S.W.3d at 631 (conditioning coverage on compliance with certain terms, including notice "as soon as practicable").[25] In other words, in those cases, as in this one, "the parties simply agreed on the

---

[24] The settlement-related language in Lennar's policy appeared in two places: Condition E and the definition of the "legal liability" that the policy covered. Lennar did not agree in either section to obtain the insurer's consent before settling a claim. Instead, both provisions merely indicated that the policy would not cover settlements to which the insurer had not consented—Condition E provided that unapproved settlements would be at Lennar's own expense, and the definition of "legal liability" required that the loss be established by adjudication or arbitration or in a settlement approved in writing. *See* 413 S.W.3d at 755.

[25] *Prodigy* and *PAJ* both involved notice requirements that were conditions precedent to coverage. This Court has explained the difference between a breach of contract and the failure to fulfill a condition precedent on numerous occasions, and the *Prodigy* and *PAJ* dissents did so as well. *See, e.g.*, *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (citing *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992)) (citations

effect of" the insureds' actions: no coverage. *Compare ante* at \_\_, *with Lennar*, 413 S.W.3d at 755–56; *Prodigy*, 288 S.W.3d at 376; *PAJ*, 243 S.W.3d at 631. "[T]he question of materiality of a breach and its subsidiary issue of prejudice," thus, "[we]re not raised." *See ante* at \_\_\_.

## B.      The "Materiality" Argument

The Court also attempts to distinguish *Hernandez*, *PAJ*, *Prodigy*, and *Lennar* on the ground that the "breaches" in those cases were immaterial while the breach in this case is material. This effort fails for two reasons. First, the "materiality" of the breach is only relevant if (1) there is, in fact, a breach and (2) the non-breaching party relies on the breach to avoid performance under the contract. But neither is true here, and nor were they true in *Hernandez*, *PAJ*, *Prodigy*, or *Lennar*. In all of these cases, the issue was not whether the insured's conduct excused the insurer from fulfilling its coverage obligations under the contract; it was whether the insurer had a coverage obligation under the contract at all. In most of these cases, including this one, the insurer did not even allege that the insured had breached the contract. Instead, in each of these cases, the insurer argued that the policy simply did not cover the loss.

Second, even if there were a breach here, the "materiality" of the breach (or lack thereof) is indistinguishable from the materiality of the "breaches" in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*. As the Court points out, in all four cases, we determined whether the insured's "breach" was "material" by examining whether the "breach" deprived the insurer of the benefit that it could have reasonably anticipated from full performance—i.e., the benefit of the bargain. *See Lennar*,

omitted); *see also Prodigy*, 288 S.W.3d at 384–88 (Johnson, J., joined by Hecht and Willett, JJ., dissenting); *PAJ*, 243 S.W.3d at 637–39 (Willett, J., joined by Hecht, Wainwright, and Johnson, JJ., dissenting). In short, when a party fails to fulfill a condition precedent to another party's obligation, the other party has no duty under the contract to perform that obligation, regardless of whether the contract has been breached. *See Solar Applications*, 327 S.W.3d at 108; RESTATEMENT (SECOND) OF CONTRACTS § 225(1), (2). The majorities' use of the material-breach analysis in *PAJ* and *Prodigy* confused failure to fulfill a contractual condition precedent with a mere breach of a contractual covenant.

413 S.W.3d at 755 ("Generally, one party's breach does not excuse the other's performance unless the breach is material. One factor in determining materiality is 'the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance.'"); *Prodigy*, 288 S.W.3d at 377 ("an immaterial breach does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation.") (quoting *PAJ*, 243 S.W.3d at 631, citing *Hernandez*, 875 S.W.2d at 692); *PAJ*, 243 S.W.3d at 631 (same); *Hernandez*, 875 S.W.2d at 692 ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.").

In each of those cases, we held that the "breach" was not "material" because it did not deprive the insurer of the benefit of the bargain, since the insurer was not prejudiced by the insured's conduct. *See Lennar*, 413 S.W.3d at 755 (holding that insurer was not deprived of the benefit of full performance because the insurer was not harmed by the insured's unapproved settlement); *Prodigy*, 288 S.W.3d at 382 (holding that insurer was not deprived of the benefit of full performance because the insurer was not harmed by the untimely notice); *PAJ*, 243 S.W.3d at 636–37 (holding that insurer was not deprived of the benefit of full performance because the insurer was not harmed by the untimely notice); *Hernandez*, 875 S.W.2d at 692 (holding that insurer was not deprived of the benefit of full performance because the insurer was not harmed by the insured's unapproved settlement). In short, we equated materiality with prejudice. *See Lennar*, 413 S.W.3d at 755; *Prodigy*, 288 S.W.3d at 382; *PAJ*, 243 S.W.3d at 633–34, 636–37; *Hernandez*, 875 S.W.2d at 692.

Under that test, the vacancy clause at issue in this case is equally immaterial because the insured's failure to reside in the house did not prejudice the insurer. Farmers, in fact, has expressly

conceded this point. Because the vacancy of the house did not contribute to cause the fire damage, the interest that the vacancy clause was designed to protect (minimizing the fire risks for a vacant dwelling) was not injured here. But for the same reasons, the interest that the prompt-notice provisions in *PAJ* and *Prodigy* were designed to protect (ensuring adequate time to gather information and prepare a defense) was not injured, and the interest that the consent provision in *Hernandez* and *Lennar* were designed to protect (the insurer's subrogation rights) was not injured. In sum, if the "materiality" test the Court announced in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar* is correct, the Court's holding today cannot be. If the Court's holding today is correct, and I agree that it is, the "materiality" test articulated in those four cases cannot be.

As the court states, "[a]t bottom this case is not about breach, it is about what coverage Greene purchased and Farmers agreed to provide. Greene seeks to have us re-write the insurance policy under the guise of 'construing' it so Farmers provides coverage it did not agree to provide, and Greene receives coverage she did not contract for." *Ante* at __. I agree, but this was equally true in *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*.[26]

## C.      Conclusion on the Material-Breach Analysis

The Court correctly identifies the heart of this matter: "At bottom this case is not about breach, it is about . . . coverage[.]" *Ante* at __. Justice Enoch correctly made the same observation his *Hernandez* dissent: "[T]his case is not about a breach of contract. This case is about coverage." 875 S.W.2d at 694. They are both right, and the same statement would be accurate about *PAJ*,

---

[26] In *Hernandez*, we "constru[ed]" the policy to cover a loss to which the policy expressly "d[id] not apply." *See Hernandez*, 875 S.W.2d at 694. In *PAJ* and *Prodigy*, we "constru[ed]" the policies to cover losses of which the insured did not provide timely notice even though the policies expressly conditioned coverage on timely notice. *See Prodigy*, 288 S.W.3d at 382; *PAJ*, 243 S.W.3d at 636. In *Lennar*, the policy expressly covered "ultimate net loss[es]," but we "constru[ed]" it to cover a loss that fell outside the definition of an "ultimate net loss." *See Lennar*, 413 S.W.3d at 756.

22

*Prodigy*, and *Lennar*. Despite the Court's efforts, there is no valid basis for distinguishing this case from *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*. Because those decisions rest on an inapplicable legal principle, they cannot logically be distinguished: How can a court distinguish the breach (or absence of a breach) in one case from the breach in an earlier case when there was no breach in the earlier case? If an insurer must show prejudice to enforce an "immaterial" provision, and provisions are "immaterial" if the insurer has suffered no prejudice, when is an insurer ever not required to show prejudice? If Texans are to have any certainty about how the courts will construe and apply their insurance contracts in future cases, we must disapprove of the reasoning on which we based our decisions in those cases.

## V.
### The Struggle for Certainty

Ultimately, I cannot join the Court's opinion in this case because it provides no clear basis on which courts or parties can decide whether the material-breach rule applies in future cases. Because we cannot distinguish this case from *Hernandez*, *PAJ*, *Prodigy*, and *Lennar*, we must follow those cases, overrule them, or expressly limit their application on some basis.[27] If we followed *Hernandez* and its progeny in this case, the rule of law would be flawed but consistent: policy provisions conditioning coverage on some conduct by the insured (like providing timely notice, obtaining consent to settle, or occupying the premises) could not be enforced absent a

---

[27] *See Lennar*, 413 S.W.3d at 759 (Boyd, J., concurring) ("[I]f we are going to continue imposing the prejudice requirement, as I agree our precedent compels us to do, we should admit we are doing so on public policy grounds, rather than continue our well-intended but ultimately inadequate efforts to justify our holdings on the basis of contract principles.").

23

showing of prejudice. And parties would have *some* certainty about when an insurer must show prejudice to enforce conditions of coverage: almost always.[28]

On the other hand, if we overruled those cases and returned to our 100-plus years of precedent before *Hernandez*, continuity would suffer but Texas's insurance case law would be back on the right track: policy provisions conditioning coverage on the existence or occurrence of some fact or event would be enforced as written and as approved by TDI, absent a statute that requires a different result. And parties would have certainty about when an insurer must show prejudice to enforce conditions of coverage: when the contract or a statute so requires.

But if we expressly limited our prior decisions to the kinds of notice and consent provisions at issue in those cases, as I recommend here, we would retain the greatest degree of continuity and certainty available under our existing precedent. An insurer would have to show prejudice to deny coverage based on an insured's failure to give prompt notice or to obtain consent to settle under provisions like those in *Hernandez* and its progeny,[29] but would not have to show prejudice to enforce other terms of coverage unless the contract so provided. To achieve this, we would have to abandon the material-breach analysis we adopted in *Hernandez* and propagated in *PAJ*, *Prodigy*, and *Lennar*. As today's decision confirms, that analysis is legally incorrect and, more importantly, practically unworkable. The principle of *stare decisis* can justify turning a blind eye to the first

---

[28] I say "some certainty" and "almost always" because the line would have to be drawn somewhere. Presumably, an insured who failed to pay her premiums could not, after a fire or flood, simply pay-up before reporting the claim and be entitled to coverage because the insured was not prejudiced by the lack of timely payments. Otherwise, no insurer would pay premiums unless or until a claim arose.

[29] I say "like those in *Hernandez* and its progeny" because the holding in those cases do not apply to all notice and consent provisions. Specifically, the *Prodigy* Court indicated that while the "as soon as practicable" notice requirement was not enforceable absent prejudice, the 90-day notice requirement in the same provision would have been enforceable absent prejudice. 288 S.W.3d at 382.

shortcoming but not the second. Because the outcome in *Hernandez* depended on the "materiality" of a breach when there was, in fact, no breach, it cannot be logically distinguished or cabined.

Because *Hernandez* and its progeny have been our precedent for the last twenty years, I conclude that we should leave their holdings in place. But because their material-breach rationale lacks the sound logical basis that is the foundation of judicial predictability, we should abandon it in favor of a public policy rationale. *See Lennar*, 413 S.W.3d at 759 (Boyd, J., concurring) ("[I]f we are going to continue imposing the prejudice requirement, as I agree our precedent compels us to do, we should admit we are doing so on public policy grounds, rather than continue our well-intended but ultimately inadequate efforts to justify our holdings on the basis of contract principles."). Having recognized that it is public policy, and not the operation of general contract law, that makes notice-of-claim and consent-to-settlement requirements like those in *Hernandez et alia* unenforceable absent prejudice, we should decline to extend that policy beyond those cases and *Puckett*, deferring instead to the TDI and the Legislature to dictate insurance policy terms, as the Court correctly does in this case.

## VI.
## Conclusion

I concur in the Court's judgment in this case, but do not agree with all of its reasoning, particularly its effort to distinguish this case from *Hernandez* and its progeny. I would acknowledge the flawed logic in that line of cases and expressly decline to extend it to any other insurance policy provisions that place the insured outside the circumstances for which there is coverage under the policy. This would permit consumers, TDI, the Legislature, insurers, and courts to reliably predict when such provisions operate according to general contract law and when the special prejudice requirement of *Hernandez* applies instead. Having restricted the judicially-imposed prejudice requirement to policy provisions that require prompt notice of claims and

25

consent to any settlements, I would defer to the Legislature and to the Texas Department of Insurance to decide whether to impose the prejudice requirement on any other policy provisions.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: August 29, 2014